[Cite as *State v. Bahner*, 2025-Ohio-5230.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 114940 |
| v. | : | |
| JEREMY BAHNER, | : | |
| Defendant-Appellant. | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 20, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-688051-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jamielle Lamson-Buscho, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Michael V. Wilhelm, Assistant Public Defender, *for appellant*.

MICHAEL JOHN RYAN, J.:

{¶ 1} Defendant-appellant Jeremy Bahner appeals his convictions on two counts of gross sexual imposition (Counts 1 and 4) and two counts of rape (Counts 2 and 3). After a thorough review of the facts and pertinent law, we affirm.

**Procedural History**

{¶ 2} In January 2024, Bahner was charged in a 17-count indictment with sexually oriented offenses. The offenses were alleged to have been committed against six victims; the alleged victims in Counts 1 through 11 and Counts 13 through 15 were alleged to have been under the age of 13. With the exception of Count 12 (endangering children), Counts 1 through 15 contained sexually violent predator specifications. Count 16 charged illegal use of minor in nudity-oriented material or performance and Count 17 charged possessing criminal tools, specifically, a cell phone that was allegedly used to commit the crime charged in Count 16.

{¶ 3} At issue in this appeal are Counts 1 through 4, which were relative to one victim, M.A. All four counts charged that the crimes were committed on or about January 1, 2018, through April 1, 2020, when M.A. was between four through six years old.

{¶ 4} Count 1 alleged that Bahner committed an act of gross sexual imposition against M.A. The act was described in the indictment as the "[c]ouch incident without penetration," and more specifically alleged that Bahner touched M.A.'s vagina. Count 2 charged that Bahner committed an act constituting rape against M.A. The indictment described the act as the "[s]hower incident" and alleged that Bahner digitally penetrated M.A.

{¶ 5} Count 3 charged that Bahner committed an act constituting rape against M.A. The indictment alleged digital penetration and described the act as the "[i]ncident on second couch with penetration." Count 4 alleged that Bahner

committed an act of gross sexual imposition against M.A. The indictment alleged that Bahner touched M.A.'s vagina and described it as the "[s]econd couch incident."

{¶ 6} Defense counsel filed a motion for separate trials for the different victims, which the trial court granted. The underlying charges of Counts 1 through 4 proceeded to a jury trial, and the sexually violent specifications were tried to the bench. The jury returned guilty verdicts on Counts 1 through 4, and the trial court found Bahner guilty of the sexually violent predator specifications.[1] The trial court sentenced Bahner to life without the possibility of parole on the two rape counts and four years to life on the two gross-sexual-imposition counts. The trial court designated Bahner as a Tier III sex offender.

**Facts as Established at Trial**

**Background**

{¶ 7} During the relevant time period, Bahner, M.A., and M.A.'s family lived in the same Parma, Ohio neighborhood. Included in M.A.'s family are two older sisters who were elementary school aged during the relevant time period. M.A. and her sisters were involved in cheerleading.

{¶ 8} Bahner has two daughters, one of whom was friends with one of M.A.'s sisters. Bahner's daughters, M.A.'s siblings, and eventually M.A., attended the same elementary school. Bahner had a pool in his backyard and a playroom in his

---

[1] Bahner pleaded guilty to Counts 10 and 14, amended from gross sexual imposition to aggravated assault, and Count 17, possessing criminal tools. The remaining counts of the indictment were dismissed.

basement, and he frequently hosted parties and sleepovers for neighborhood children, which often included M.A. and her sisters. In addition to the social aspect of Bahner's involvement with M.A. and her family, Bahner also provided child-care services for M.A. and her siblings. M.A.'s mother testified about how that came about.

{¶ 9} The mother was a nurse, and for the 2017-2018 school year had to be at work before her older children (not M.A.) left for school. The mother's fiancé, who lived with the family, also worked outside of the home. Therefore, the mother had a nanny who came in the mornings to get the children ready for school and stayed for the day to care for M.A.

{¶ 10} M.A.'s mother testified that her earliest awareness of Bahner resulted after he stopped by her house when she was not home and left a business card for his auto repair shop with the nanny. The mother became more acquainted with Bahner because he had constructed a wagon in which he would take his girls and neighborhood children to school. The mother described the wagon as modeling an 1800s-covered wagon — it was made from a flatbed and was motorized. The mother's older children were invited and accepted rides in the wagon.

{¶ 11} M.A. started kindergarten in 2019, and her mother determined that the nanny's services were no longer needed. M.A. joined her siblings in the wagon rides to school. Generally, M.A.'s mother would be home in the afternoon by the time the children arrived home from school, but on the few occasions she had to stay late, Bahner offered to have the children come to his house; M.A.'s mother accepted

the invitation. The child-care arrangement with Bahner continued until March 2020, when the COVID-19 pandemic forced shutdowns and the mother's fiancé began working from home. In September 2020, M.A. and her family moved from their home in Bahner's neighborhood.

{¶ 12} M.A.'s mother testified to two incidents that she believed, in hindsight, should have been red flags about Bahner. One incident occurred on an occasion when she went to Bahner's house to get her girls. Upon arriving at the house, the two older girls were in the backyard and M.A. was in the house. The mother knocked on the door. When M.A. came out she was "sweaty"; Bahner followed shortly thereafter, and he had the imprint of M.A.'s head on him. Tr. 406.

{¶ 13} The second incident occurred when M.A. was around four or five years of age, and she told her mother that she did not want to go to Bahner's house anymore. When the mother questioned M.A. as to why, M.A. told her that Bahner had touched her thigh. M.A.'s mother admitted that, after that, if M.A. wanted to go to Bahner's house, she still allowed her.

{¶ 14} M.A.'s mother also testified that she noticed a change in M.A.'s demeanor after the last party M.A. attended at Bahner's house. Cheerleading was an important part of M.A.'s life, and M.A. had just learned that she made a "mini-level two team," which the mother described as "a huge accomplishment." *Id.* at 407. M.A. was not excited, however. Her mother testified that M.A. "hated it," "was crying all the time," and ultimately quit the team. *Id.* Around the same time, M.A. also hated going to school.

**The Disclosure and Investigation**

{¶ 15} As mentioned, M.A. and her sisters participated in cheerleading. On May 30, 2023, M.A.'s mother was at the gym where her girls participated in cheerleading and heard concerning talk about Bahner. Once at home, the mother questioned her girls; M.A. made a disclosure. M.A.'s mother contacted the police.

{¶ 16} Jordan Remi, a social worker from the Cuyahoga County Division of Children and Family Services ("CCDCFS"), became involved with M.A.'s family in June 2023. Remi worked in the specialized sex abuse unit and testified about the State-mandated specialized training that employees in the sex abuse unit take. Remi explained that questioning of suspected sex-abuse victims is open-ended so as to gather as much information as possible and then make the appropriate referrals based on what is learned.

{¶ 17} Remi first conducted a home visit with M.A.'s mother, M.A., and her siblings. Remi then conducted forensics interview of M.A. and her two sisters; the interviews took place at a child advocacy center. The forensic interview of M.A. was admitted into evidence at the trial as State's exhibit No. 22. After Remi's interview of M.A. and her sisters, Remi gave M.A.'s mother referrals for counseling for the girls.

{¶ 18} Over the defense's objection, the State questioned Remi about the prevalence of delayed disclosures in sex-abuse cases. According to Remi, the majority of the sex-abuse interviews she performed involved delayed disclosures. Relative to disclosures involving younger children, Remi testified that delayed

disclosure is common because younger children often do not understand the nature of sexual abuse when it is occurring and, to the extent they sense something was inappropriate, may have a fear of getting in trouble.

{¶ 19} The investigating detective on the case was Christy Cappelli, who worked for the Parma Police Department in the sexual assault and juvenile units. Detective Cappelli testified that she contacted M.A.'s mother on June 1, 2023, regarding M.A.'s disclosure. Detective Cappelli was present for the forensic interviews of the M.A. and her sisters. The detective explained that she did not make a referral for M.A. to see a sexual assault nurse examiner ("SANE nurse") because such an examination is only useful if conducted within 72 hours of the alleged abuse. Detective Cappelli testified that, in her training and experience, delayed disclosures of sexual abuse are common.

**The Inappropriate Sexual Contact and Conduct**

{¶ 20} M.A. testified that there was a couch in the playroom and one in the living room and when Bahner had sleepovers some of the children would sleep on the couches, while others would sleep on the floor. M.A. would often sleep on the couch. She described the couch sleeping arrangement as follows: one child on one end, one child in the middle, and one child on the other end.

{¶ 21} M.A. testified about three inappropriate interactions Bahner had with her. M.A. testified that one time when she was on the couch during the daytime, Bahner was also on the couch and touched her "[w]here my bathing suit bottoms

go." Tr. 434. M.A. elaborated that Bahner used his hand to touch her underneath her clothes "where girls normally pee." *Id.* at 435.

{¶ 22} M.A. testified to another occasion at nighttime when she was on the couch and Bahner touched her. M.A. described that it was like the first touch — Bahner touched her "under where my bathing suit goes," using his hand to go inside her "private part." *Id.* at 436-437. M.A. clarified that it was his fingers that went inside her "private part." *Id.* at 452.

{¶ 23} The third incident happened on an occasion when M.A. spent two consecutive nights at Bahner's house and showered there. M.A. testified that while she was in the shower, Bahner came into the bathroom to ask if she had washed her "armpits," "butt," "private part," and to see if she needed help. *Id.* at 441. M.A. testified that Bahner opened the shower curtain and "did the same thing that he did on the couch." M.A. elaborated that Bahner put body wash on his hand and then "put his hand in my private part." *Id.* at 442. Like the second couch incident, M.A. testified that Bahner used his fingers. *Id.* at 448. M.A. described that she felt "uncomfortable" and "weird." *Id.* at 442.

{¶ 24} M.A.'s sisters also testified. According to one sister, when they were at Bahner's house he would sometimes ask the children there if they wanted to "cuddle" with him. *Id.* at 469. The sister testified that she saw Bahner cuddling with M.A. The other sister testified that she saw Bahner sleeping next to M.A. on a couch.

**Assignments of Error**

{¶ 25} Bahner raises the following two assignments of error for our review:

I. The trial court allowed impermissible expert testimony over objection.

II. The conviction was against the manifest weight of the evidence.

**Law and Analysis**

**CCDCFS' Social Worker Provided Proper Lay Witness Testimony**

{¶ 26} In his first assignment of error, Bahner contends that, over the defense's objection, the trial court erred by allowing CCDCFS social worker Jordan Remi to give impermissible expert testimony about delayed disclosures. Specifically, Bahner challenges the testimony on the ground that Remi did not file an expert report pursuant to Crim.R. 16(K), which requires expert witnesses generate written reports and that those reports be disclosed to the opposing party no later than 21 days before trial.

{¶ 27} We initially address Bahner's characterization of Remi's testimony about delayed disclosures as expert testimony. Evid.R. 702 governs expert opinion testimony and provides in part as follows:

> A witness may testify as an expert if the proponent demonstrates to the court that it is more likely than not that all of the following apply:
>
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

{¶ 28} A review of the record shows that the State did not offer Remi as an expert witness, the court did not qualify her as an expert witness, and she did not testify as an expert witness. Rather, Remi testified as a lay witness.

{¶ 29} Evid.R. 701 governs opinion testimony by lay witnesses and states as follows: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶ 30} This court has held that a State witness not presented as an expert can properly testify under Evid.R. 701 when "(1) the testimony is based on the witness's training or experience, (2) the testimony relates to the witness's personal observations with the investigation, and (3) the testimony is helpful to determine a fact at issue." *State v. Calhoun*, 2017-Ohio-8488, ¶ 34 (8th Dist.), citing *State v. Wilkinson*, 2014-Ohio-5791 (8th Dist.). Further, this court has held that "a trial court may allow a social worker to testify to the general manner in which children disclose sexual abuse so long as no opinion is offered as to the truth of the victim's statements." *State v. Peterson*, 2024-Ohio-2903, ¶ 31 (8th Dist.).

{¶ 31} Here, Remi testified about her relevant work experience, educational background, and specialized training in conducting forensic interviews. Regarding delayed disclosures in younger children, Remi testified that younger children often are not aware of the exact nature of the abuse in the moment; that is "they typically

don't understand what's happening in the moment, and they don't understand what it is that happened may have not been okay, so they just keep quiet about it, their fear of getting in trouble, they think they did something wrong . . . ." Tr. 496. Remi further testified that it is common for forensic interviews to take place well after the incident, as was the case with the majority of the interviews she conducted. Remi did not offer an opinion as to the truth of M.A.'s disclosure.

{¶ 32} Our review of the admission or exclusion of evidence by the trial court is for an abuse of discretion. *State v. Griffin*, 2025-Ohio-1459, ¶ 32 (8th Dist.). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 33} On this record, the trial court did not abuse its discretion by allowing Remi to testify as to her lay opinions about delayed disclosures. Her testimony was based on her perceptions as a trained sexual-abuse investigator and were helpful for the jury to understand why a sexual-abuse victim may delay disclosure. Moreover, Detective Cappelli similarly testified that, in her training and experience, delayed disclosures of sexual abuse are common. And neither Remi nor Detective Cappelli offered their opinion about the truth of M.A.'s disclosure.

{¶ 34} In *State v. Belle*, 2019-Ohio-787 (8th Dist.), and *State v. Bright*, 2024-Ohio-2803 (8th Dist.), this court upheld the testimony of lay witnesses testifying as to the manner of disclosure for sexual-assault victims when the State set forth the necessary foundation.

{¶ 35} In *Belle*, this court upheld a SANE nurse's testimony about victims' recollections of sexual assaults as permissible lay opinion testimony. The panel noted that the State laid a foundation demonstrating that the nurse had a sufficient amount of experience and training and her testimony was based on her personal knowledge and experience. Therefore, this court held that the SANE nurse's "testimony fell within the ambit of Evid.R. 701's requirement that the lay opinion be rationally based on firsthand observations and helpful in determining a fact in issue." *Id.* at ¶ 48.

{¶ 36} In upholding a social worker's lay opinion testimony about stages of disclosure, the *Bright* panel relied on *State v. Mathis*, 2019-Ohio-3654 (8th Dist.), in which a defendant also argued that a sex-abuse social worker improperly provided expert testimony regarding the manner in which sexually abused children disclose their abuse. Prior to offering her opinion, the social worker provided a brief summary of her education and credentials, which included specialized sexual-abuse training in interviewing children. The *Mathis* Court found that the social worker's testimony was based on her firsthand experience, was helpful to determine a fact at issue in the case and, therefore, was permissible lay witness testimony. *Id.* at ¶ 63.

{¶ 37} At oral argument, defense counsel conceded that the controlling case law allows a qualified lay witness, such as Remi, to testify that it is common for victims to delay disclosing sexual abuse. However, counsel fine-tuned his argument to state that a lay witness testifying as to *why* a victim would delay disclosure is improper. We disagree.

{¶ 38} To reiterate, lay opinion testimony is allowed when it is based on the witness's perceptions and experience and would assist the jury in the determination of disputed issue of fact. Evid.R. 701; *Calhoun*, 2017-Ohio-8488, at ¶ 34 (8th Dist.), citing *Wilkinson*, 2014-Ohio-5791 (8th Dist.). For example, it has been held that an officer is permitted to give lay testimony regarding his or her perceptions of behavioral and language patterns of people commonly observed on the streets. *State v. Harris*, 2020-Ohio-5306, ¶ 83 (11th Dist.).

{¶ 39} Similarly, in *Mathis*, 2019-Ohio-3654 (8th Dist.), this court made it clear that a social worker can testify about the *why* of "long-term disclosure," stating that a social worker's testimony "about the manner in which sexually abused children disclose the nature of their abuse based on her experience with such cases," is admissible lay opinion testimony. *Id.* at ¶ 61, 63. The social worker's testimony in *Mathis* explained why "it is common" for child-sexual-abuse victims to give a partial disclosure (and sometimes even denials) before giving a full disclosure. *Id.* at ¶ 62. The social worker explained, and this court upheld, her testimony on *why* long-term disclosures are common: "It doesn't all come out at once. It's like a child feels free to say so much at one time, and then maybe another day, or later, the child will say more about what happened. They're processing it, and it is a long-term disclosure." *Id.*

{¶ 40} It is true, as noted by this court in *Mathis*, that there can be a fine line between expert opinion testimony and lay opinion testimony. *See id.* at ¶ 59. But the Ohio Supreme Court has held that in cases such as this one, although lay opinion

testimony may be of a "technical nature," it is nonetheless permissible because it is "on a subject outside the realm of common knowledge" but still "within the ambit of [Evid.R. 701's] requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue." *State v. McKee*, 91 Ohio St.3d 292, 296-297 (2001); *Mathis* at *id.*

{¶ 41} Remi's testimony conformed to the requirements set forth by Evid.R. 701 and this court's precedents. The first assignment of error is therefore overruled.

## The Convictions are Supported by the Weight of the Evidence

{¶ 42} For his second assigned error, Bahner contends that his convictions are against the manifest weight of the evidence. We disagree.

{¶ 43} When considering a manifest-weight-of-the-evidence challenge, this court reviews the entire record and "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 44} The gravamen of Bahner's weight-of-the-evidence challenge revolves around M.A.'s credibility. For example, one area Bahner cites was M.A.'s inability to testify as to exactly when the incidents occurred. That circumstance, along with

other alleged conflicts Bahner references, do not create such a manifest miscarriage of justice that a new trial is necessitated.

{¶ 45} Although we review witnesses' credibility when considering the manifest weight of the evidence, we are mindful that the credibility of witnesses is primarily an initial determination for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. This is so because the trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 2007-Ohio-2202, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77 (1984).

{¶ 46} We are also mindful that this court has consistently held that a victim's testimony alone is sufficient to support a rape conviction. *State v. Smith*, 2023-Ohio-1670, ¶ 20 (8th Dist.); *State v. Roan*, 2020-Ohio- 5179, ¶ 21 (8th Dist.); *State v. Blankenship*, 2001 Ohio App. LEXIS 5520, *11 (8th Dist. Dec. 13, 2001). "There is no requirement that a rape victim's testimony be corroborated precedent to conviction." *Roan* at *id*. Indeed, "[t]here are often no witnesses to the crimes of rape or sexual molestation, as such acts typically take place behind closed doors." *State v. Boyts*, 1996 Ohio App. LEXIS 3143, *14 (9th Dist. July 24, 1996).

{¶ 47} M.A.'s testimony was not so incredible so as to cast doubt on the convictions and require a new trial. Further, although there were no witnesses to the crimes Bahner committed against M.A., the State presented circumstantial evidence corroborating M.A.'s disclosure. Specifically, M.A.'s mother testified about

M.A. previously telling her that Bahner had touched her thigh; M.A.'s mother testified about a time when she went to get M.A. that she, in hindsight, thought could have been a red flag; and M.A.'s sisters testified that they saw Bahner on the couch with M.A., cuddling with her and sleeping next to her.

{¶ 48} We further note that when sexual-assault victims are young children, "it is reasonable that they [are] not able to remember exact times and dates of the rapes. This is especially true where the crimes involve several instances of conduct spread out over an extended period." *State v. Humfleet*, 1985 Ohio App. LEXIS 8718, *7 (12th Dist. Sept. 9, 1985), citing *State v. Madden*, 15 Ohio App.3d 130, 132 (12th Dist. 1984); *see also State v. Geboy*, 145 Ohio App.3d 706, 724-725 (3d Dist. 2001), and *State v. Henderson*, 2006-Ohio-5567, ¶ 14 (8th Dist.), quoting *State v. Koelling*, 1995 Ohio App. LEXIS 1056 (10th Dist. Mar. 21, 1995). ("'It is well settled that, particularly in cases involving sexual misconduct with a child, the precise times and dates of the alleged offense or offenses oftentimes cannot be determined with specificity.'").

{¶ 49} Although M.A. was unable to testify as to the exact dates when the abuse occurred, she was able to testify with specificity about the illegal sexual contact and conduct Bahner perpetrated on her. Specifically, M.A. testified about three incidents where Bahner (1) used his hand to touch her underneath her clothes "where girls normally pee" (Count 1, gross sexual imposition); (2) used his fingers to go inside her "private part" (Counts 3 and 4, rape and gross sexual imposition,

respectively); and (3) put his hand, specifically, his fingers, in her "private part" while she was showering (Count 2, rape).

{¶ 50} We do not deem M.A.'s testimony so incredible so as to find that the jury lost its way in resolving conflicts in her testimony and prior statements or that this case is the exceptional case in which a manifest miscarriage of justice occurred. The second assignment of error is therefore overruled.

{¶ 51} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

EILEEN A. GALLAGHER, A.J., and
DEENA R. CALABRESE, J., CONCUR