[Cite as *State v. Yaeger*, 2026-Ohio-2186.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 115642 |
| v. | : | |
| KAEDEN YAEGER, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED AND REMANDED
**RELEASED AND JOURNALIZED:** June 11, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-697704-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Halie Turigliatti, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Rick Ferrara, Assistant Public Defender, *for appellant.*

TIMOTHY W. CLARY, J.:

{¶ 1} Defendant-appellant Kaeden Yaeger ("Yaeger") appeals from his convictions and sentence following a jury trial. For the following reasons, we affirm and remand.

**Factual and Procedural History**

{¶ 2} Yaeger was originally charged in a juvenile complaint, and on December 9, 2024, he was bound over to adult court from juvenile court.

{¶ 3} On December 27, 2024, a Cuyahoga County Grand Jury indicted Yaeger and his codefendant, Ivan Lapsley ("Lapsley"), on one count of aggravated robbery in violation of R.C. 2911.01(A)(1), one count of robbery in violation of R.C. 2911.02(A)(1), one count of robbery in violation of R.C. 2911.02(A)(3), one count of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B), and one count of aggravated menacing in violation of R.C. 2903.21(A). The aggravated robbery and robbery charges each carried one- and three-year firearm specifications.

{¶ 4} Yaeger initially pleaded not guilty to all charges. The case proceeded to a jury trial on July 23, 2025.

{¶ 5} The State called Mohammed Herbawi ("Mohammed"), who testified that until March 2025, his family owned 81st Deli ("the deli") on East 81st Street and Superior Avenue in Cleveland, Ohio. Mohammed testified that on October 23, 2024, he was working at the deli from 4:00 p.m. to closing time, which was around midnight. Mohammed testified that at the time of the incident in this case, he was working at the deli with his brother Wael Herbawi ("Wael") and another employee, the cook. Mohammed testified that shortly after midnight on October 24, 2024, he had just finished helping several customers and was tending the cash register where someone was waiting; Mohammed "went up to them and they had a gun in my hand

— in his hand." (Tr. 269.) When asked to describe the person further, Mohammed testified that the person was a white male and he had a black gun; Mohammed identified Yaeger at trial as the person he saw with a gun. According to Mohammed, he believed that the deli was being robbed; the person did not say anything to Mohammed, and Mohammed did not see that he had anything in his hands other than the gun. Mohammed testified that while this was happening, the cook was in the kitchen and Wael was in the back room.

{¶ 6} Mohammed testified that he had a permit to carry a concealed weapon and that he owned a legally purchased firearm — a 9 mm semiautomatic Taurus TH9 — that he was wearing in a hip holster at the time of the incident. Mohammed testified that when he saw Yaeger's gun, he froze, and Wael came out of the back room, saw what was happening, and Yaeger ran out the door of the deli. According to Mohammed, he then came out from behind the register and walked up to the door to try and see where Yaeger went and if he could see the license plate of his vehicle to give to the police. Mohammed testified that he followed Yaeger and he saw Yaeger get into the passenger side of a Ford F-150 truck that was parked head-in in the deli's parking lot, right in front of the door. Mohammed testified that both Yaeger and the truck's driver were pointing guns at him straight through the truck's front windshield. According to Mohammed, he then drew his weapon and fired because he was scared for his life.

{¶ 7} Mohammed testified that as he fired, the truck backed out of the parking space and exited the parking lot. Mohammed was unsure if he hit anyone

when he fired his gun, but he testified that the truck "crashed out across the street at the pole." (Tr. 286.) At that point, Mohammed called the police. The State played Mohammed's 911 call during his direct examination. On the call, Mohammed stated that the two suspects were white; Lapsley is black. Mohammed testified that after the truck crashed into a pole across the street from the deli, he saw one of the individuals exit the truck and leave before coming back to get the second individual before they both fled. Mohammed testified that the police took his gun that night; the State introduced his gun as evidence at trial.

{¶ 8} Mohammed testified that the deli had been having issues with its surveillance system the month of this incident, stating, "We tried to get it fixed and the guy that was supposed to fix it never came." (Tr. 291.) He testified that the security cameras were on but not recording.

{¶ 9} Mohammed also testified that the holster and magazine found near the truck were not his and were not something sold at the deli.

{¶ 10} The State also called Wael, who testified that on the evening of the incident in this case, he was in the back room of the deli stocking the coolers. Wael testified that when he came out of the back room, he saw a white man with a gun. Wael testified that he thought they were being robbed, and his reaction when he saw the gun was to duck and jump to the side because he could not help Mohammed because Mohammed had a gun and Wael did not. Wael further testified that he was prohibited from owning a firearm because he was a felon.

**{¶ 11}** Wael testified that a short time after he ducked, he heard gunshots. He testified that he likely yelled to make sure that his brother was okay, but he could not remember specifics. Wael testified that he eventually went outside and saw the suspects' truck crash into a pole across the street.

**{¶ 12}** During Wael's cross-examination, defense counsel played the audio recording of Wael's interview with the police after the incident. In that recording, Wael did not say that he saw someone standing in the deli with a gun; he said that he saw something chrome in the person's hand. The audio recording also reflected that Wael told police that when he heard gunshots, he went outside and tried to open the door of the truck.

**{¶ 13}** Wael also testified at trial that he recognized Yaeger as the man who was standing inside the deli with a gun, but he did not recognize Lapsley. Wael testified that he did not hear Yaeger say anything and he did not see Yaeger leave the deli with anything.

**{¶ 14}** The State called Cleveland police officer Elias Lay ("Officer Lay"), who testified that he responded to the deli on October 24, 2024, following Mohammed's 911 call reporting a robbery and the suspects crashing their vehicle. The initial description of the suspects provided to Officer Lay was two white males. Officer Lay testified that upon arriving at the scene to locate the suspects, "[t]he truck was pretty smashed against the pole, so we would imagine that they were injured." (Tr. 440.) Officer Lay testified that he and his partner ultimately located the suspects on the ground on East 85th Street, not far from the deli. One suspect — Yaeger — had

sustained a gunshot wound to his leg and the other suspect — Lapsley — had sustained a gunshot wound to the back of his head. Officer Lay testified that his partner applied a tourniquet to Yaeger's leg to stop the bleeding, and Yaeger stated that "he went in there [to the deli] to steal Twisted Teas and then the owner started shooting." (Tr. 441.) Officer Lay described both Lapsley and Yaeger as frantic.

{¶ 15} Officer Lay identified Yaeger and Lapsley at trial. Officer Lay testified that although Lapsley was not a white male as initially described, his investigation was not impeded by this detail because Yaeger had identified Lapsley as the driver of the truck. Further, Officer Lay had learned that there was gunfire in response to the robbery, and both Lapsley and Yaeger had gunshot wounds that were consistent with being at the robbery.

{¶ 16} According to Officer Lay, law enforcement recovered a magazine and holster from outside of the crashed truck but did not recover a firearm. Officer Lay testified that both suspects were transported to the hospital to be treated for their injuries and he returned to the deli to prepare a report and speak with the deli's owner. Officer Lay testified that Mohammed claimed that one of the suspects came into the deli, "grabbed Twisted Teas, came up to the counter[,]" and Mohammed went to grab something before going back to the counter, at which point Mohammed said that Yaeger pointed a gun at him. (Tr. 448.) Officer Lay testified that according to Mohammed, Wael then came out from the back of the store and yelled or screamed at Yaeger:

> They had a vocal altercation and then he said he got scared and ran
> out the door out the store and then [Wael] came up, went to the door,

and he stated that [Yaeger] had a gun pointed at him as he was getting in the car and they were reversing.

. . .

Oh, as they were pulling off, the store owner brother [sic] started shooting because he thought he was going to shoot at him. So he said he shot and didn't hesitate. And then that's when he saw them crash and then run in that direction.

(Tr. 448-449.)

{¶ 17} Officer Lay also testified that other law enforcement took photos of the scene and collected physical evidence, such as shell casings, from the deli parking lot. Officer Lay returned to the hospital to speak with the suspects; he testified that Lapsley told him that he got a call or text message from Yaeger that he needed a ride to the west side and did not "have any recollection that he was going to rob the store." (Tr. 452.) Lapsley stated that at the deli, he saw Yaeger run back into the truck, shots were fired, Lapsley reversed the truck out of the parking spot, and then proceeded to crash.

{¶ 18} The State called Detective Orlando Velazquez ("Detective Velazquez"), who testified that he worked for the crime-scene unit of the Cleveland Division of Police. Detective Velazquez testified that he responded to the deli in the early morning hours of October 24, 2024, following a call from dispatch about a shooting. Detective Velazquez photographed the crime scene and the evidence therein, including the 17 shell casings that were found scattered throughout the deli's parking lot. According to Detective Velazquez, the shell casings were all 9 mm, but there was no way to confirm if they were all fired from the same weapon.

Detective Velazquez also identified bullet fragments in the parking lot, as well as the green Glock extended magazine containing 13 live 9 mm rounds and the black holster that were recovered from near the crashed truck. Detective Velazquez testified that he did not believe that the extended magazine recovered from near the truck was compatible with the firearm taken from Mohammed at the scene because they were different makes and models. Detective Velazquez also testified that there were suspected bullet defects on the truck.

{¶ 19} The State called Detective Tywon Little ("Detective Little"), who testified that he was a detective with the Cleveland Division of Police. Detective Little testified that he was assigned to assist on this case on October 24, 2024, the morning following the incident, and he was specifically tasked with going to the deli to obtain video footage of the incident and speak with the victims. Detective Little testified that he had read the report before going to the deli that morning. At the deli, Detective Little spoke with Mohammed and Wael over the phone. Detective Little testified that Mohammed informed him that surveillance footage of the incident was unavailable because the system was down. Detective Little testified that during his phone conversation with Mohammed, Mohammed informed him that the driver of the truck had pointed a gun at him; this differed from Mohammed's statement to Officer Lay that Yaeger pointed a gun at him and his trial testimony that both suspects pointed guns at him.

{¶ 20} Detective Little testified that he obtained video footage of part of the incident from a Real Time Crime Center ("RTCC") camera located near the deli. The

State played this footage at trial; it depicts a blue truck exiting the deli parking lot, briefly driving westbound on Superior Avenue, and ultimately crashing into a pole. The video also shows one suspect — later identified as Yaeger — exit the passenger side of the truck, reach into the truck to grab something, and run southwest towards East High School. During the State's direct examination of Detective Little, he described the item Yaeger was holding as a gun. Detective Little also testified:

> Mr. Yaeger was holding an item with two hands similar to when we rack a firearm. So a firearm has two bases where you have the frame and you have the top slide. On a Glock we practice with every day you kind of have the bottom frame and you have a top frame and it moves you see where they rack around. That's what we do in practice when we try to unjam a gun. Sometimes we will tap the bottom and then rack the gun at the top.

> The way he was holding the firearm is similar or the items it was similar to what we do with our firearms.

(Tr. 553-554.)

{¶ 21} The video then depicted Yaeger go back towards the truck as a second individual — Lapsley — exited the driver side of the truck. Detective Little testified that approximately eight minutes passed from the time that the truck crashed to the point at which Yaeger made contact with law enforcement by knocking on the window of a police car.

{¶ 22} The State also introduced a photograph of the inside of the truck after it crashed; the photograph depicts two deployed airbags and two cans of Twisted Tea inside the truck. Detective Little testified that the passenger-side window of the truck was shattered. Detective Little testified that neither of the suspects were tested

for gunshot residue because there was no evidence that either had fired a gun. He also testified that neither Wael nor Mohammed was tested for gunshot residue.

{¶ 23} Detective Little testified that the holster and magazine that were recovered from near the truck were tested for DNA and the results were inconclusive. Detective Little also testified that he personally canvassed the area to search for a firearm, and several other officers and K-9 units canvassed the area as well, but no firearm was recovered.

{¶ 24} The State rested after the admission of the evidence and testimony described above. Yaeger and Lapsley separately made Crim.R. 29 motions for acquittal; the court overruled both motions. Yaeger did not present any evidence in his defense.

{¶ 25} Lapsley testified in his defense. He testified that he did not have the best memory of the events of October 24, 2024, because he had been shot twice in the back of his head. Lapsley testified that earlier in the day, he had been working with Yaeger's brother doing construction work at a house on Superior and East 110th Street in Cleveland. He further testified that he owned an Infiniti G37, but at the time of the incident, he was driving his neighbor's Ford F-150 because they had swapped cars for the day because Lapsley did not want to take his car to a construction site.

{¶ 26} Lapsley testified that before he left work, he received a call from Yaeger asking for a ride from his house at East 91st Street and Superior to the west side. Lapsley testified that he knew Yaeger through Yaeger's brother and they were

good friends.  According to Lapsley, he picked up Yaeger and they stopped at a store to pick up Twisted Teas on the way to the west side.  Lapsley testified that he intended to pay for the beverages, and he and Yaeger both had their own cash on them at the time.  Lapsley testified that he told Yaeger he would pay for the beverages, gave Yaeger cash, and Yaeger went into the store.  Lapsley then remembered Yaeger getting into the car with Twisted Tea cans cradled in his arms, Lapsley put the car in reverse, and they got shot at.  According to Lapsley, he did not see that Yaeger had a firearm on him at any point and he did not know whether Yaeger owned a firearm at the time.  Lapsley testified that he did not own a firearm.

{¶ 27} Lapsley also testified that Wael was the person who shot at them:

DEFENSE COUNSEL:  Okay. Were you able to get a good look at the person who was shooting at you?

LAPSLEY:  Yes.

DEFENSE COUNSEL:  And you've been present throughout the beginning of this trial.  Have you recognized the person who shot at you?

LAPSLEY:  Yes.

DEFENSE COUNSEL:  Who shot at you?

LAPSLEY:  I call him by Vinny but his real name is Wael Herbawi.

DEFENSE COUNSEL:  So you heard testimony that throughout this trial that Mohammed Herbawi says that he was the one that was shooting.

LAPSLEY:  Correct.

DEFENSE COUNSEL:  Are you sure it was not him?

LAPSLEY:  I can't forget the image.

(Tr. 699.)  Lapsley testified that he did not remember the truck crash.

{¶ 28} Both defendants renewed their Crim.R. 29 motions, and the court again denied those motions.

{¶ 29} The jury found Yaeger guilty of aggravated robbery, one count of robbery, and aggravated menacing, along with the attendant firearm specifications. The jury found Yaeger not guilty of one count of robbery and improper handling of a firearm.  The jury found Lapsley not guilty of all counts.

{¶ 30} On August 6, 2025, the court held a sentencing hearing.  Count 1, aggravated robbery, and Count 2, robbery, merged for sentencing, and the State elected to proceed with sentencing on Count 1.  The assistant prosecuting attorney, defense counsel, and Yaeger addressed the court.  The court sentenced Yaeger to three years on Count 1, three years for the three-year firearm specification attached to Count 1, three years for the three-year firearm specification attached to Count 2, and 59 days in jail for Count 5, aggravated menacing, with credit for time served. Yaeger's total sentence was nine years in prison.

{¶ 31} Yaeger appealed.  He raises three assignments of error for our review:

I. The trial court abused its discretion in allowing an officer to testify to matters not within his perception and admitting into evidence the exhibit to which he testified, and in allowing hearsay testimony, violating the rules of evidence.

II. The manifest weight of the evidence did not support Yaeger's convictions.

III. The trial court erred in imposing two identical firearm specifications for a single crime.

**Law and Analysis**

**I. Detective Little's Testimony**

{¶ 32} In his first assignment of error, Yaeger argues that the trial court abused its discretion when it permitted Detective Little to testify that Yaeger was racking a gun in a video exhibit. Yaeger also argues that the trial court abused its discretion when it permitted Detective Little to testify to a report that he had not personally prepared.

{¶ 33} The admission or exclusion of evidence is a matter left to the trial court's sound discretion and therefore will not be disturbed absent an abuse of discretion. *State v. Simmons*, 2013-Ohio-1789, ¶ 18 (8th Dist.), citing *State v. Frazier*, 2012-Ohio-1198, ¶ 17 (8th Dist.). An abuse of discretion occurs when a court exercises its discretion in an unwarranted way in regard to a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 34} With respect to Detective Little's testimony about what Yaeger was doing in the video, Yaeger argues that the testimony violated Evid.R. 701 because Detective Little was able to prejudicially identify the object in Yaeger's hands as a gun.

{¶ 35} Evid.R. 701 governs opinion testimony by lay witnesses and states: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." This

court has held that a State witness not presented as an expert can properly testify under Evid.R. 701 when "'(1) the testimony is based on the witness's training or experience, (2) the testimony relates to the witness's personal observations with the investigation, and (3) the testimony is helpful to determine a fact at issue." *State v. Bahner*, 2025-Ohio-5230, ¶ 30 (8th Dist.), quoting *State v. Calhoun*, 2017-Ohio-8488, ¶ 34 (8th Dist.), citing *State v. Wilkinson*, 2014-Ohio-5791 (8th Dist.).

{¶ 36} Here, Detective Little testified that he has investigated hundreds of cases involving guns and that he practices unjamming guns daily, and he described that process and what it looks like. Further, Detective Little's testimony as to what he observed in the video footage clearly related to his personal observations made as part of his investigation. Finally, because it was not at all apparent from the video that Yaeger had a gun, Detective Little's testimony that the way Yaeger's hands were moving was similar to the way they would move if he were racking a firearm, the testimony was helpful to determine a fact at issue — specifically, whether Yaeger had a firearm during the incident.

{¶ 37} In light of the foregoing, we cannot conclude that the trial court abused its discretion in permitting Detective Little to testify as to his observations of Yaeger in the video footage.

{¶ 38} With respect to Detective Little's testimony as to a report he did not personally prepare, Yaeger argues that because Detective Little was not the responding officer that made the Computer-aided Dispatch ("CAD") report, the testimony was inadmissible hearsay. Specifically, Yaeger refers to two pieces of

testimony. The claimed hearsay testimony occurred during the State's direct examination of Detective Little:

> ASSISTANT PROSECUTING ATTORNEY: Would reviewing the CAD refresh your recollection?
>
> DETECTIVE LITTLE: Yes.
>
> ASSISTANT PROSECUTING ATTORNEY: I'm handing you the CAD again. Let me know if you see on page 3 — if it refreshes your recollection of what the two suspects did when the police first saw them.
>
> DETECTIVE LITTLE: At 12:30 it states here they took off running when they seen [sic] the zone car.

(Tr. 662.) Yaeger argues that the error of admitting this testimony was compounded because the State used it during its cross-examination of Lapsley:

> ASSISTANT PROSECUTING ATTORNEY: And then why when police arrived did you run from police?
>
> LAPSLEY: I didn't. I walked away if I'm correct.
>
> ASSISTANT PROSECUTING ATTORNEY: Okay. So, if the police put in their report not knowing you or any of the facts before that the suspects took off running when they saw the zone car, that's a lie.
>
> LAPSLEY: Look at the body cam footage. You'll see that's a lie.

(Tr. 708.)

{¶ 39} As discussed above, we generally review the admission or exclusion of evidence for an abuse of discretion. Because Yaeger did not object to the aforementioned testimony at trial, however, he has forfeited all but plain error.[1]

---

[1] Yaeger asserts in his brief that the report was referenced in testimony "over defense objection that the report be used" citing page 660 of the trial transcript. While there was a defense objection on that page of the transcript, there was no reference to the

*State v. McInnes*, 2026-Ohio-734, ¶ 61 (8th Dist.), citing *State v. Rogers*, 2015-Ohio-2459, ¶ 3. "Crim.R. 52(B) authorizes appellate courts to correct "'[p]lain errors or defects affecting substantial rights' notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court.'"" *Id.*, quoting *State v. Mosby*, 2024-Ohio-5210, ¶ 24 (8th Dist.), quoting Crim.R. 52(B). Courts are to take notice of plain error with the "'utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.'" *State v. Barnes*, 2020-Ohio-3184, ¶ 23 (8th Dist.), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 40} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Yaeger argues that the statement in the CAD report that the suspects were running from the police is hearsay because no testifying officer, including Detective Little, actually observed the suspects running or made a report to that effect. In response, the State argues that the testimony was an exception to the hearsay rule because it was a "recorded recollection" pursuant to Evid.R. 803(5).

{¶ 41} Evid.R. 803(5) describes a recorded recollection as "a memorandum or record concerning a matter about which a witness once had knowledge but not has insufficient recollection to enable him to testify fully and accurately, shown by the testimony of the witness to have been made or adopted when the matter was

---

CAD report until several pages later in the transcript, and there is no indication that the objection was made on hearsay grounds.

fresh in his memory and to reflect that knowledge correctly." While Detective Little testified that he reviewed the CAD report as part of his investigation, the relevant statements in the CAD report were not made by him. Therefore, this exception does not apply to permit admission of the CAD report.

{¶ 42} Although Detective Little did not personally observe the suspects running when they first encountered a police car, following a thorough review of the record, we cannot say that Detective Little's brief testimony as to the CAD report amounted to a plain error that affected Yaeger's substantial rights and requires a reversal. Detective Little testified that he had previously reviewed the CAD report as part of his investigation. The path taken by the suspects in the minutes between the truck crashing and their encounter with law enforcement was thoroughly fleshed out at trial in the direct and cross-examination of multiple witnesses; Detective Little's testimony as to the CAD report was relevant to the issues in dispute at trial. Further, there was testimony in the record — including previous testimony from Detective Little — that shortly after the crash Yaeger actually approached law enforcement of his own volition because he needed medical attention.

{¶ 43} Although Detective Little's testimony as to the CAD report constituted inadmissible hearsay, this testimony did not constitute plain error. For these reasons, Yaeger's first assignment of error is overruled.

## II. Manifest Weight

{¶ 44} In Yaeger's second assignment of error, he argues that his convictions are against the manifest weight of the evidence. Specifically, he asserts that because

the jury acquitted Lapsley on the basis that Lapsley's account of the incident was reliable and Mohammed's account was not, Yaeger also should have been found not guilty because the same evidence was used to convict him. According to Yaeger, Mohammed and Wael's testimony could not overcome the presumption of Yaeger's innocence. Following a thorough review of the record, we disagree.

{¶ 45} "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on its effect in inducing belief.'" *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 1997-Ohio-52, ¶ 24. "'A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which evidence weighs heavily against conviction."'" *State v. Travis*, 2022-Ohio-1233, ¶ 28 (8th Dist.), quoting *State v. Crenshaw*, 2020-Ohio-4922, ¶ 243 (8th Dist.), quoting *Thompkins* at ¶ 25.

{¶ 46} As an initial matter, we note that Yaeger's interpretation of the jury's verdicts is merely an assumption of how the jury reached its verdicts against Yaeger and Lapsley, and we decline to indulge in such assumptions in our analysis of Yaeger's assignment of error. *See United States v. Powell*, 469 U.S. 57, 67 (1981), citing *McDonald v. Pless*, 238 U.S. 264 (1915) ("Courts have always resisted inquiring into a jury's thought processes.").

{¶ 47} Yaeger was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), which provides that "[n]o person, in attempting or committing a theft

offense. . . or in fleeing immediately after the attempt or offense, shall [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."[2]

{¶ 48} The record in this case reflects that Yaeger admitted to stealing two cans of Twisted Tea from the deli. The record further reflects that multiple Twisted Tea cans were found in the crashed truck, corroborating Yaeger's admission. Yaeger does not dispute this on appeal; therefore, the fact that Yaeger committed a theft offense is not at issue. The record further reflects that both Mohammed and Wael observed Yaeger at the deli counter, near the cash register, with a firearm, pointing the firearm in the direction of Mohammed and the cash register. Additionally, a magazine and holster were recovered near the crashed truck.

{¶ 49} Moreover, all of the arguments that Yaeger now makes in support of this assignment of error — that the Herbawis "overreacted" to Yaeger, that they gave conflicting statements, and that they had incentive to lie because of Wael's criminal history — were all thoroughly fleshed out at trial. The jury heard these arguments from defense counsel throughout trial, defense counsel vigorously cross-examined

---

[2] When counts in an indictment are allied offenses that are merged for the purposes of sentencing, the reviewing court need not consider the sufficiency or the weight of the evidence thereon because any error relating to those counts would be harmless. *State v. Lucas*, 2024-Ohio-842, ¶ 49 (8th Dist.), quoting *State v. Harder*, 2023-Ohio-2384, ¶ 25, citing *State v. Ramos*, 2016-Ohio-7685, ¶ 14 (8th Dist.). Further, Yaeger's manifest-weight argument did not include any explicit references to any of the counts or specifications of which Yaeger was found guilty. Therefore, because the robbery offense merged into the aggravated-robbery offense for sentencing, our analysis only includes the aggravated-robbery offense.

all of the State's witnesses including Wael and Mohammed, and the jury was able to hear and view the evidence and weigh it themselves.

{¶ 50} In light of the foregoing, we cannot conclude that the jury lost its way and created such a manifest miscarriage justice that the convictions must be reversed. Because Yaeger's convictions are not against the manifest weight of the evidence, his second assignment of error is overruled.

## III. Firearm Specifications

{¶ 51} In his third assignment of error, Yaeger argues that the trial court erred when it imposed two firearm specifications despite the underlying offenses merging for sentencing. Specifically, Yaeger challenges the imposition of both the three-year firearm specification for aggravated robbery and the three-year firearm specification for robbery, despite the fact that the robbery offense merged into the aggravated-robbery offense for sentencing.

{¶ 52} R.C. 2929.14(B)(1)(b) provides, in relevant part, that "[e]xcept as provided in division (B)(1)(g) of this section, a court shall not impose more than one prison term on an offender under division (B)(1)(a) of this section for felonies committed as part of the same act or transaction." The Ohio Supreme Court has recognized that, as explicitly noted in R.C. 2929.14(B)(1)(b), this general rule is subject to the exception set forth in 2929.14(B)(1)(g), which provides:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies,

the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender pleads guilty and, in its discretion, may also impose on the offender the prison term specified under that division for any or all of the remaining specifications.

*State v. Bollar*, 2022-Ohio-4370, ¶ 12, quoting R.C. 2929.14(B)(1)(g).

{¶ 53} In interpreting the plain language of R.C. 2929.14(B)(1)(g), the Ohio Supreme Court held that the statute requires that the offender receive prison terms for each of the two most serious firearm specifications when the offender pleads guilty to multiple felony offenses (and at least one of those is a felony listed in the statute) and also pleads guilty to multiple accompanying specifications, and moreover, "[t]he statute makes no exception to the application of its provisions if one of the underlying felony offenses has been merged." *Id*. at ¶ 19. The Court further held that R.C. 2941.25's merger provision does not override R.C. 2929.14(B)(1)(g) because the latter is the more specific and more recently enacted statute. *Id*. at ¶ 21.

{¶ 54} Because Yaeger was convicted of two or more felonies, one of which was aggravated robbery, and he was convicted of a three-year firearm specification of the type described in R.C. 2929.14(B)(1)(a)(ii), the trial court was required to impose a prison term for each of the two most serious specifications of which Yaeger pleaded guilty.

{¶ 55} Yaeger acknowledges the Ohio Supreme Court's holding in *Bollar* but asserts that the opinion does not reflect the plain language of the statute or the sensible operation of the statute or decades of law in opposition to the holding. This

court has consistently followed *Bollar* since its release, and we decline to stray from this precedent.

{¶ 56} Therefore, Yaeger's third assignment of error is overruled.

{¶ 57} Finally, we sua sponte note that the August 6, 2025 sentencing journal entry omits the maximum prison term imposed on Yaeger pursuant to the Reagan Tokes Law. Accordingly, the case is remanded for the sole purpose of issuing a nunc pro tunc sentencing journal entry to adequately reflect the sentence imposed at the August 6, 2025 sentencing hearing.

{¶ 58} Judgment affirmed and case remanded.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for the issuance of a nunc pro tunc sentencing journal entry and execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIMOTHY W. CLARY, JUDGE

MARY J. BOYLE, P.J. and
SEAN C. GALLAGHER, J., CONCUR