[Cite as *State v. Byrd*, 2026-Ohio-2317.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                             No. 115479

    v.                            :

SAMUEL BYRD, JR.,                       :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 18, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-695029-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney and Stephen Vernia, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Michael V. Wilhelm, Assistant Public Defender, *for appellant.*

MARY J. BOYLE, P.J.:

{¶ 1} Defendant-appellant Samuel Byrd, Jr. ("Byrd") appeals his convictions for two counts of strangulation following a jury trial in the Cuyahoga

County Court of Common Pleas.[1]  He raises the following two assignments of error for our review:

> **Assignment of Error I:**  The State did not lay the proper foundation for a lay witness to testify as to whether person could be strangled and then not display any symptoms after the fact.

> **Assignment of Error II:**  It was ineffective assistance of counsel to not request a self-defense instruction where the only possible defense to R.C. 2903.18 was self-defense.

{¶ 2}  After careful review of the record, we affirm Byrd's convictions.

## I.  Facts and Procedural History

{¶ 3}  In September 2024, Byrd was charged in an eight-count indictment. Count 1 charged felonious assault, a second-degree felony; Count 2 charged strangulation, a second-degree felony; Count 3 charged robbery, a second-degree felony; Count 4 charged robbery, a third-degree felony; Count 5 charged strangulation, a third-degree felony; Count 6 charged strangulation, a fourth-degree felony; Count 7 charged abduction, a third-degree felony; and Count 8 charged obstructing official business, a fifth-degree felony.  Byrd pled not guilty and multiple pretrials followed.  In March 2025, Byrd's case proceeded to a jury trial.  The State presented seven witnesses and numerous exhibits.  At the close of the State's case and following Byrd's Crim.R. 29 motion for acquittal, the trial court dismissed Count

---

[1] Byrd does not contest his robbery conviction.

2, strangulation, a second-degree felony, and Count 7, abduction, a third-degree felony. [2] Byrd then testified on his own behalf.

{¶ 4} The jury returned a guilty verdict on two counts of robbery (renumbered Counts 2 and 3, formerly Counts 3 and 4) and two counts of strangulation (renumbered Counts 4 and 5, formerly Counts 5 and 6). The jury found Byrd not guilty of Count 1, felonious assault, and not guilty of Count 8, obstructing official business, as originally charged in the indictment.

{¶ 5} At sentencing, renumbered Count 3 merged with renumbered Count 2, and the State elected to proceed on renumbered Count 2, robbery, a felony of the second degree. In addition, renumbered Count 5 merged with renumbered Count 4 and the State elected to proceed on renumbered Count 4, strangulation, a felony of the third degree. The trial court sentenced Byrd to a minimum of 3 to a maximum of 4.5 years in prison, on the robbery count, and 36 months on the strangulation count. The counts were ordered to be served concurrently. The trial court ordered a mandatory minimum of 18 months, up to a maximum of 3 years of postrelease control. He was ordered to pay court costs and was given 261 days of jail-time credit. Byrd timely appeals his convictions.

{¶ 6} The following is a summary of the evidence that is pertinent to this appeal.

---

[2] Prior to the jury deliberating, the trial court renumbered the indictment because of the dismissal of the two counts.

{¶ 7} The 29-year-old M. S. testified that she met Byrd online and they had an arrangement where she would exchange sexual favors for money. She explained that she did not drive, so Byrd would get her and drive her to his house where they would spend time together barbequing, drinking, and smoking. The two had been seeing each other for a few months prior to the incident on August 29, 2024.

{¶ 8} According to M.S., on the day of the incident, she and Byrd were drinking alcohol and sitting in Byrd's backyard when she received a phone call from another customer requesting her services. She testified that Byrd became angry and took her cell phone. M.S. testified that she performed oral sex on Byrd in an attempt to retrieve her phone. When she grabbed his phone instead of hers, he grabbed her by the throat and choked her until she returned his phone. M.S. testified that she then punched out a window in Byrd's house because she was angry that he would not return her phone.

{¶ 9} M.S. admitted to punching out several of Byrd's windows because he would not return her phone. She testified that Byrd broke her phone, kicked her in the head, and stomped on her. She testified that Byrd hit her and she fell. She said she did not hit her head when she fell on the pavement; however, Byrd kicked her in the head. She explained that, at one point, she ran across the street and asked a neighbor for help; however, Byrd chased her and slammed her phone on the ground again. M.S. ran to another neighbor's house and begged the neighbor to call police. When the neighbor did not answer, M.S. walked out in the street yelling for someone to help her.

{¶ 10} Eventually, EMS and police arrived. M.S. went by ambulance to MetroHealth Medical Center. According to the medical records, M.S. was diagnosed with a brain bleed, lacerations to her hand, as well as superficial bruises to her back, abdomen, and extremities; however, she had no documented injuries to her neck. (State's exhibit No. 73.) The records also indicate that M.S. tested positive for alcohol, THC, and hydrocodone. (State's exhibit No. 73 and tr. 837.)

{¶ 11} M.S. testified that she was intoxicated at the time of the incident because she drank two bottles of vodka. Prior to this incident, M.S. testified that she suffered from multiple brain aneurisms, had undergone brain surgery, and was diagnosed with multiple mental illnesses. On the day in question, she testified that she did not take her prescribed medications because she was drinking. M.S. testified that she could not leave without her phone because all of her important information was in that phone, including her contacts and doctor's appointments.

{¶ 12} Byrd recorded on his cellphone multiple exchanges between M.S. and himself, which were introduced during M.S.'s testimony. Based on video evidence, M.S. and Byrd started arguing around 4:00 p.m. In State's exhibit No. 1, M.S. can be observed down the street from Byrd's house, making a phone call. She accuses Byrd of assaulting her, and Byrd accuses her of lying and stealing. M.S. is holding her purse, her phone, and a nearly empty bottle of clear liquor. During the recording, Byrd vacillates from laughing at M.S. to yelling at her. The video ends.

{¶ 13} Approximately 15 minutes later, M.S. is on Byrd's porch hitting him and trying to mace him. Byrd tells her to leave. The video ends. (State's exhibit No. 2.)

{¶ 14} Three hours later, Byrd's videos resume. (State's exhibit No. 3.) Now, the two are in Byrd's driveway near the backyard. M.S. can be observed crying and visibly in pain. Her hand is bleeding from punching out the window of the side door to Byrd's house. She again accuses Byrd of assaulting her and asks him to call the police. Byrd laughs at her, denies assaulting her, and accuses her of biting him. He tells her she will live, she did not hit an artery, and he is not calling for help until she admits on video that she punched out his window. They enter the house, and M.S. keeps saying, "[Y]ou beat me up"; Byrd replies, "[I]f you keep saying that I am gonna beat you up for real." The video ends.

{¶ 15} Approximately 12 minutes later, Byrd starts recording again. (State's exhibit No. 4.) M.S. can be observed getting up off of the floor in Byrd's living room; her shirt is bloody. M.S. keeps requesting her phone. Byrd accuses her of breaking more windows in the house. The video cuts out with Byrd yelling stop touching me.

{¶ 16} Byrd resumes recording two minutes later. (State's exhibit No. 5.) M.S. can be observed face-down on the floor in the kitchen, screaming. M.S. gets up and runs out of the house. She stumbles across the street requesting help from the neighbor. Byrd yells to the neighbor to record her. M.S. comes back and Byrd tells her to take her phone and her purse and leave. She does. The video ends.

{¶ 17} Approximately five minutes later, Byrd resumes recording. (State's exhibit No. 6.) The two are outside at the end of Byrd's driveway. M.S. can be observed getting up off of the ground. He is telling her to stay off his property. M.S. repeats "you beat me up" and "you broke my phone." He admits he broke her phone and keeps repeating "get off my property." She tries to spit on him; Byrd says, "I'm defending myself." The video pans to the house, a loud noise can be heard, and when the video refocuses, M.S. is on her back on the ground, she is trying to take her headwrap off of her face, and part of Byrd's leg is in view. M.S.'s arms goes limp, and Byrd's foot is on M.S.'s neck. He steps back and records M.S. lying on her back with her arms and legs spread. M.S.'s headwrap is over her face, and she is breathing heavily but not moving. Byrd tells her to leave. After several seconds, M.S. pulls her headwrap off of her face and asks, "[W]hy did you hit me?" He keeps telling her to leave. She eventually stands up and approaches Byrd and tries to get his phone. She is knocked to the ground again. Byrd repeatedly blames M.S. saying she fell. M.S. gets up and tries to spit on and hit Byrd. He mocks her saying, "[Y]eah that hurts, yeah that hurts." M.S.'s voice is raspy, barely audible, and she repeats "help, help." The video cuts out.

{¶ 18} The neighbor testified that she heard Byrd and M.S. arguing earlier in the day. The neighbor then left her home to visit a friend. Sometime after 7:00 p.m., she observed M.S. on her ring camera, covered in blood, and asking for help. She called 911. The neighbor identified her ring camera footage, as well as her 911 call. (State's exhibit Nos. 7, 8, and 21.) In the ring camera footage, Byrd and M.S. can be

heard screaming at each other. (State's exhibit No. 7.) It also depicts M.S. running across the street to a neighbor's house while Byrd chases her. Byrd can be observed slamming M.S. to the ground and slamming her phone on the ground twice. Both of them go back to Byrd's driveway, where a vehicle obstructs much of the ring camera footage; however, it records Byrd saying, "I'm defending myself." Then through the reflection in the car, Byrd can be observed slamming M.S. into the car, and then M.S. falls to the ground.

{¶ 19} The neighbor testified that she was unable to return home that evening because Byrd and police were involved in a standoff.

{¶ 20} A second neighbor testified that she called 911 because she observed M.S. lying on the ground covered in blood. (State's exhibit No. 72.) In the call, she indicated that Byrd and M.S. had been arguing earlier in the day, and now M.S. was bleeding heavily, even leaving blood marks on Byrd's house. She also testified about the lengthy standoff that occurred between Byrd and the police.

{¶ 21} The ER doctor testified from the medical records, State's exhibit No. 73, regarding her observations, diagnosis, and treatment of M.S.[3] She identified M.S.'s medical records and testified that M.S. suffered from subdural hematoma (a brain bleed) and bruising on her back and shoulders, including a handprint on her back. The ER doctor confirmed that M.S. did not have any visible injuries to her neck.

---

[3] The ER doctor's testimony will be developed more fully in the law and analysis section.

{¶ 22} Multiple Cleveland police officers testified before the State rested. Bodycam videos were played for the jury, and photos of M.S.'s injuries, as well as the crime scene were admitted without objection.

{¶ 23} Byrd testified on his own behalf. He indicated that he was 42 years old and owned the home where the events unfolded. Byrd confirmed that he and M.S. had an arrangement where he would pay her for sexual favors. He testified that they were friends and spent time together watching television, talking on the phone, and visiting with his friends.

{¶ 24} Byrd explained that on the day of the events he had the day off from work and planned to have friends over for a cookout because it was a nice summer day. He invited M.S. and got her around noon.

{¶ 25} Byrd testified that M.S. was actually drinking tequila, not vodka, and had one bottle not two. He emphasized that she was very intoxicated, but he was not intoxicated because he was only drinking beer. Byrd testified that he was outside grilling and when he went inside the house for some seasonings, he noticed M.S. stealing his earbuds, jewelry, and money. He said he reached out to grab his belongings and M.S. punched out a window to his house. Byrd testified that there was no blood at first and that she punched several windows, breaking six in total.

{¶ 26} Byrd then testified that M.S. punched out the first window because he would not have sex with her. He explained that she was not bleeding at that time and that was when he recorded her in the street calling someone. He testified that she apologized and begged him to let her back in his house, which he did but now

regrets.  He testified that they continued to spend time together in the backyard while he cooked on the grill.

{¶ 27} Byrd testified that he "[caught] her yet again" and then she punched out several windows and "[n]ow there is blood.  So, I [got] angry." (Tr. 947.)  He explained that he had observed her stealing again and that she ran out of the house with his money.  He chased her across the street to retrieve his belongings and a struggle ensued.  He admitted that he slammed her phone on the ground because he was angry about the broken windows.  Byrd denied pushing her down and stated that she fell.  He testified that she fell a lot that day because she was so intoxicated. (Tr. 1071, 1072, 1076.)

{¶ 28} Byrd denied receiving oral sex from M.S. on that day.  He denied hitting her, choking her, kicking her, stomping her, or standing on her head.  Byrd testified that all of her injuries were self-inflicted.  He stated that M.S. hit him, bit him, kicked him, and maced him.  Byrd admitted that he took her phone when she broke the first window after he declined to have sex with her.  He planned to sell it to pay for the broken window.

{¶ 29} Defense counsel played State's exhibit No. 6 for Byrd and questioned him about what transpired in the recording.  Byrd replied that "she was attacking [him]. [His] phone wound up getting knocked out of [his] hand.  As [his] phone was on the ground, [he] used [his] foot to separate her so [he] could grab and retrieve [his] phone and then [he] removed [his] foot." (Tr. 973.)  He testified that he put his foot on her chest as "a blockade." (Tr. 973.)  When asked how she ended up the

ground, Byrd stated, "[S]he went to swing on me and basically threw a haymaker and missed and went to the ground." (Tr. 974.)

{¶ 30} On cross-examination, Byrd admitted that he did not call the police when M.S. broke his windows. He also did not call 911 when M.S. asked him to because he does not "believe in calling 911." (Tr. 991.) He admitted that he was busy recording M.S. and continued to deny assaulting M.S.

{¶ 31} Byrd's exhibits were admitted without objection, and defense counsel renewed his Crim.R. 29 motion, which the trial court denied. Finally, there was a discussion initiated by the trial court with counsel regarding the video evidence wherein Byrd can be heard stating that he was defending himself. The trial court stated that the jury would be instructed that

> [t]here was video evidence of [Byrd] stating self-defense. Self-defense is an area of the law; however, you must not consider any legal arguments of self-defense because the law is not given to you; and therefore, you cannot substitute your own idea of what the law is.

(Tr. 1003.) Both the State and the defense agreed that the jury would not be instructed on self-defense.

## II. Law and Analysis

{¶ 32} Initially we note that Byrd does not challenge his robbery convictions; rather, he challenges his convictions for strangulation. He was convicted of strangulation in violation of R.C. 2903.18(B)(2), which states that "[n]o person shall knowingly . . . create a substantial risk of serious physical harm to another by means of strangulation or suffocation [third-degree felony]"; and R.C. 2903.18(B)(3),

which states that "[n]o person shall knowingly . . . cause or create a substantial risk of physical harm to another by means of strangulation or suffocation [to a person with whom the offender is in a dating relationship; fourth-degree felony]."

{¶ 33} R.C. 2903.18(A)(1) defines "strangulation or suffocation" as "any act that impedes the normal breathing or circulation of the blood by applying pressure to the throat or neck, or by covering the nose and mouth." Indeed, the jury can determine whether stepping on someone's neck until they stop moving creates a substantial risk of serious physical harm or a substantial risk of physical harm.

## A. Expert or Lay Witness Testimony

{¶ 34} In Byrd's first assignment of error, he alleges that the trial court erred in allowing lay witness testimony about strangulation without proper foundation in violation of Evid.R. 701. He further argues that this improper admission went to the ultimate question in this case of strangulation and Byrd was prejudiced by this testimony.

{¶ 35} The admission or exclusion of evidence by the trial court is reviewed by this court for an abuse of discretion. *State v. Griffin*, 2025-Ohio-1459, ¶ 32 (8th Dist.), citing *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. We note that a trial court has broad discretion concerning the admission or exclusion of evidence. *State v. Jones*, 2022-Ohio-2270, ¶ 31 (8th Dist.), citing

*State v. Harris*, 2016-Ohio-391, ¶ 14 (8th Dist.), citing *State v. Pawlak*, 2014-Ohio-2175 (8th Dist.).

{¶ 36} The parties agree that the ER doctor was called by the State as a fact (lay) witness. Byrd does not dispute that the ER doctor is a "highly trained emergency room physician who went to medical school. [And] likely has treated neck injuries"; however, he alleges that the State did not qualify the ER doctor as an expert witness by laying the proper foundation. (Byrd's brief, p. 9.) Byrd argues that the ER doctor's testimony was speculative and prejudiced Byrd "[b]ecause the jury was told that neck trauma could be caused without visible injury, the jury was certain to determine that [M.S.] suffered trauma even though the State did not otherwise demonstrate that [Byrd] applied significant pressure to [M.S.'s neck]." (Byrd's brief, p. 9.)

{¶ 37} The State contends that Evid.R. 701 permits treating physicians to testify based on personal perception and proper foundation was laid for the ER doctor's testimony about neck injuries based upon her knowledge, training, and experience. The State relies upon *State v. Rydarowicz*, 2023-Ohio-916 (7th Dist.), to support the admissibility of lay opinions from medical professionals without requiring expert qualification.

{¶ 38} Opinion testimony by lay witnesses is governed by Evid.R. 701, which states the following:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the

witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

{¶ 39} In the instant case, the ER doctor detailed her education, training, and experience, which included that she was a member of the American College of Emergency Physicians, as well as certified in basic life support, advanced cardiac life support, and trauma protocol. At the time of trial, the ER doctor had been an emergency room physician at MetroHealth Medical Center for approximately seven years.

{¶ 40} The ER doctor also explained the hospital procedures for patients whom EMS believe are having a heart attack, stroke, or trauma. She testified that the patients are routed through the life flight office; the patient's condition is categorized; and a proper team is assembled prior to the patient's arrival. Upon arrival, the team is briefed by EMS of all pertinent information including the circumstances surrounding the injury.

{¶ 41} After this testimony, a sidebar was requested by the State to determine whether the ER doctor should be qualified as an expert. The trial court indicated that the State did not need to qualify the ER doctor as an expert witness because she was the treating physician. The trial court then set forth the specific parameters regarding the testimony that was permitted by the ER doctor. This sidebar was not placed on the record; however, during cross-examination, the trial court repeated the parameters on the record during a sidebar. The trial court stated:

> You cannot ask her any questions about her medical opinion beyond the four corners of the medical records . . . [the ER doctor] can report

what's in there, but she cannot give an opinion about causation, meaning she cannot opine as to what specifically caused the findings if it's not medically documented in her medical records.

So, for example, I would not allow, you know, essentially, to say what level of force is required to produce this type of injury? You can say if this is reported, what are your concerns? And what testing would you do?

. . .

She can testify to what is in the four corners of the medical records, she could explain the treatment, but she cannot opine as to, you know, how much force is required or what could have possibly happened to her that caused specifically this or specifically that and rule out or rule in different things.

. . .

For example, what do you do based on this information? This information that was given. What were the tests? What were the results of those tests? What do those tests mean? Not going into what other things could cause this brain bleed, she could testify this was reported in the tests that were given, these are the results. Not why don't you opine on what other mechanisms would have caused this.

(Tr. 841-846.)

{¶ 42} With those parameters in mind, the State questioned the ER doctor who testified that M.S. in this case was routed through the life flight office as a trauma patient and EMS provided that M.S. was physically assaulted, struck multiple times, reported loss of consciousness, and had a wound to the right wrist. M.S. reported that she was hit, kicked, and strangled. (State's exhibit No. 73.) The ER doctor testified that the information that is reported "helps guide the decisions that we make about what scans and imaging to do." (Tr. 821.) Based on the reported information, the ER doctor testified that scans of the head, neck, spine, chest,

abdomen, and pelvis were ordered, as well as x-rays of the right forearm, left hand, left elbow, left shoulder, left knee, right shoulder, and right hand.

{¶ 43} The ER doctor testified that tests showed a brain bleed; however, she did not testify as to what might have caused the brain bleed. She also testified that there was "a wide range of brain bleeds[,]" which have "a rating system documented by neurosurgery that can tell you the odds of a patient's mortality or death." (Tr. 831.) Additionally, she testified that there were no "outward signs of trauma in the [M.S.'s] neck." (Tr. 829.) The ER doctor testified that she was not aware of what caused M.S. to lose consciousness; however, when choking is reported a patient could have injuries to the blood vessels of the neck that may change the treatment and management of the patient; however, there was no finding of broken blood vessels in M.S.'s neck. She also testified that injuries to the neck are not always present with reports of choking. (Tr. 831-832.)

{¶ 44} On cross-examination, Byrd questioned the ER doctor regarding every physical finding or lack thereof reported in M.S.'s medical records. The ER doctor was not, however, questioned about any tests that M.S. underwent or the findings made as a result of the testing. Specific to the issue at hand, Byrd asked the following questions:

> DEFENSE: Take a look at the physical findings, specifically, regarding the throat and neck.
>
> ER DOCTOR: Okay.
>
> DEFENSE: Patient speaking in clear sentences, tolerating secretions which means she can swallow, right?

ER DOCTOR:  Correct.

DEFENSE:  And denies neck pain.  No tenderness to palpation.  That means you touch it as a doctor, right?

ER DOCTOR:  Correct.

DEFENSE:  No posterior — what's the next word?

ER DOCTOR:  Pharyngeal.  When we ask you to say "ah."  That's the back of the throat.

DEFENSE:  In the objective findings of her throat conducted at the hospital had absolutely no findings of anything; am I correct?

ER DOCTOR:  Correct.

(Tr. 856-857.)

{¶ 45} On redirect examination the State asked:

Doctor, when we were talking about areas to the neck, specifically [defense counsel] was talking about the examination of the neck, and [that] there were no findings.

Will it always be — I don't want to say evidence — will there always be an indication that there was some form of trauma or contact on the neck present when you [conduct] your examination?

(Tr. 859.)  Byrd objected, the trial court overruled Byrd's objection, and the ER doctor responded "No."  (Tr. 859.)  The State again questioned the ER doctor regarding what information dictates what tests will be administered.  The ER doctor explained that "[the doctors] examine the patient head to toe regardless" of what information the patient or EMS provide.  (Tr. 860.)

{¶ 46} Following the ER doctor's testimony, Byrd argued that the trial court improperly allowed the State to elicit expert testimony.  Evid.R. 702, provides that

a

witness may testify as an expert if (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; and (C) The witness' testimony is based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The trial court overruled Byrd's objection.

{¶ 47} We note that "'Evid.R. 701 affords the trial court considerable discretion in controlling the opinion testimony of lay witnesses.'" *State v. Slaughter*, 2026-Ohio-1190, ¶ 29 (8th Dist.), quoting *State v. Grajales*, 2018-Ohio-1124, ¶ 60 (5th Dist.), citing *State v. Harper*, 2008-Ohio-6926, ¶ 37 (5th Dist.), citing *Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 113 (1989). Further, this court has held that a lay witness's testimony is properly admitted under Evid.R. 701 when "'(1) the testimony is based on the witness's training or experience, (2) the testimony relates to the witness's personal observations with the investigation, and (3) the testimony is helpful to determine a fact at issue.'" *State v. Bahner*, 2025-Ohio-5230, ¶ 27 (8th Dist.), quoting *State v. Calhoun*, 2017-Ohio-8488, ¶ 34 (8th Dist.), citing *State v. Wilkinson*, 2014-Ohio-5791 (8th Dist.); *State v. Primeau*, 2012-Ohio-5172 (8th Dist.); *State v. Cooper*, 2006-Ohio-817 (8th Dist.).

{¶ 48} Importantly, courts have used Evid.R. 701 "'to permit treating physicians to render opinions based upon their personal observations and perceptions.'" *State v. Heineman*, 2016-Ohio-3058, ¶ 16 (8th Dist.), quoting *Williams v. Reynolds Rd. Surgical Ctr., Ltd.*, 2004-Ohio-1645, ¶ 3 (6th Dist.); *see*

*State v. McKee*, 91 Ohio St.3d 292, 296 (2001) ("It is consistent with this emerging view of Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702."). "The opinion of a layperson uses a reasoning process familiar in everyday life, as opposed to the opinion of an expert using a reasoning process that is mastered by a specialist in the field." *State v. Rydarowicz*, 2023-Ohio-916, ¶ 54 (7th Dist.), citing *State v. Baker*, 2020-Ohio-7023, ¶ 34 (7th Dist.), citing *State v. Johnson*, 2014-Ohio-1226, ¶ 56 (7th Dist.). Nevertheless, "where a treating physician has been properly identified as a fact witness prior to trial, the treating physician . . . may not testify as an expert as to the ultimate question" in the case. *Heineman*, at ¶ 16 (8th Dist.), quoting *Hurst v. Poelstra*, 1995 Ohio App. LEXIS 5812 (2d Dist. Dec. 22, 1995).

{¶ 49} After careful review of the record, we find that the State set forth sufficient foundation for the ER doctor to answer whether visible signs of injury to the neck are always present when someone is strangled. The ER doctor testified that she was an emergency room physician for approximately seven years, had specialized training in treating trauma patients, and she specifically testified on direct examination that when choking is reported a patient could have injuries to the blood vessels of the neck; however, injuries to the neck are not always present with reports of choking. (Tr. 831-832.) She confirmed that M.S. did not have visible signs of injury to her neck. The ER doctor did not opine as to how or why M.S. lost consciousness or how she sustained the brain bleed. She simply reported the facts

that she personally observed and that the medical records were documented, as well as facts based on her experience.

{¶ 50} In addition, Byrd did not establish that he was prejudiced by this testimony. Although he seems to argue that the ER doctor's testimony is the only evidence presented that Byrd created a substantial risk of serious physical harm or caused or created a substantial risk of physical harm by means of strangulation, that is not the case. The most convincing piece of evidence was provided by Byrd recording himself stepping on M.S.'s neck until she stopped moving.

{¶ 51} Consequently, we find that the trial court did not abuse its discretion by allowing the ER doctor's testimony.

{¶ 52} Accordingly, Byrd's first assignment of error is overruled.

**B. Self-Defense**

{¶ 53} In Byrd's second assignment of error, he alleges ineffective assistance of counsel for his counsel's failure to request a self-defense instruction despite evidence supporting it. He claims that the video evidence shows Byrd's and M.S.'s actions, including placing his foot on M.S.'s neck, could justify self-defense and failure to pursue it is objectively unreasonable impacting Byrd's right to a fair trial. The State asserts that defense counsel's performance was within the range of reasonable professional assistance and a strategic trial tactic and that the evidence presented at trial was insufficient to warrant a self-defense claim or jury instruction.

{¶ 54} To establish ineffective assistance of counsel, Byrd must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance

prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697; *State v. Giguere*, 2023-Ohio-4649, ¶ 28 (8th Dist.).

{¶ 55} In Ohio, every properly licensed attorney is presumed to be competent, and a defendant claiming ineffective assistance of counsel bears the burden of proving otherwise. *State v. Davis*, 2021-Ohio-4015, ¶ 25 (8th Dist.), citing *State v. Black*, 2019-Ohio-4977, ¶ 35 (8th Dist.). When evaluating counsel's performance on an ineffective-assistance-of-counsel claim, the court "must indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689.

{¶ 56} "As a general matter, defense counsel's tactical decisions and trial strategies, even 'debatable' ones, do not constitute ineffective assistance of counsel." *State v. Scarton*, 2020-Ohio-2952, ¶ 90 (8th Dist.). A defense counsel's decision about which theory or defense to pursue at trial is a matter of trial strategy "'within the exclusive province of defense counsel to make after consultation with his [or her] client.'" *State v. Murphy*, 91 Ohio St.3d 516, 524 (2001), quoting *Lewis v. Alexander*, 11 F.3d 1349, 1354 (6th Cir. 1993).

{¶ 57} Byrd contends that there was legally sufficient evidence that his use of force was in self-defense. He says that trial counsel should have argued that he was justified in "briefly placing his foot on [M.S.'s] neck after she fell to the ground"

and that the "foot to the neck needed to be explained." (Byrd's brief, p. 10 and 13.) Byrd further points out that the medical evidence showed no findings of neck trauma challenging the State's claim that strangulation offenses were committed by him. Instead, he argues that the video evidence shows Byrd chasing M.S. and tugging over M.S.'s cellphone when she fell onto the ground and that he used his foot to keep her down and away from him. While he admits there was some physical contact with their struggling over her phone, he claims that this is no proof of strangulation. According to Byrd, State's exhibit No. 6, a video, shows M.S. as the aggressor, assaulting him by hitting, spitting, threatening him with mace. He points out that there is no evidence that he put his hands around M.S.'s neck. He argues further that this video evidence can be interpreted by a jury as sufficient evidence that he was defending himself against M.S. who admitted to biting him.

{¶ 58} "A defendant is entitled to a self-defense jury instruction when he presents legally sufficient evidence for every element of a self-defense claim." *State v. Palmer*, 2024-Ohio-539, ¶ 20. In Ohio, a person may use deadly force in self-defense when he or she

> (1) "'was not at fault in creating the situation giving rise to the affray'";
> (2) "'had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force'"; and (3) "'did not violate any duty to retreat or avoid the danger.'"

*State v. Wilson*, 2024-Ohio-776, ¶ 20, citing *State v. Messenger*, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

{¶ 59} "[W]hen a defendant presents evidence that tends to support that the defendant used force against another in self-defense or in defense of another, the state must prove beyond a reasonable doubt that the defendant did not use the force in self-defense or defense of another." *State v. Warth*, 2023-Ohio-3641, ¶ 29 (1st Dist.), citing R.C. 2901.05(B)(1). The State then must "disprove one or more of the elements of self-defense." *Id.*, citing *State v. Mitchell*, 2023-Ohio-2604, ¶ 17 (1st Dist.).

{¶ 60} We apply as written the first and third elements because they are straightforward. The second element, however, "had a bona fide belief of imminent bodily harm is both objective and subjective: whether the defendant's belief is objectively reasonable and whether the defendant subjectively had an honest belief of imminent bodily harm." *Id.*, citing *State v. Moore*, 2023-Ohio-2864, ¶ 10 (9th Dist.).

{¶ 61} In this matter, the record reflects that the defense counsel made the strategic, tactical decision to argue, based upon the video evidence presented and Byrd's own testimony, that there was no evidence of strangulation and not to argue that Byrd acted in self-defense because it is clear based upon all of the evidence presented at trial there was insufficient evidence produced warranting a self-defense claim and jury instructions.

{¶ 62} Regarding the first element of a self-defense claim, which asks whether the defendant was at fault in creating the situation that gave rise to the affray, this court has held that "'a person cannot provoke an assault or voluntarily

enter into an encounter and then claim a right to self-defense.'" *State v. Sekic*, 2011-Ohio-3978, ¶ 15 (8th Dist.), quoting *State v. Nichols*, 2002 Ohio App.LEXIS 329 (4th Dist. Jan. 22, 2002). *See also State v. Smith*, 2020-Ohio-4976, ¶ 53 (1st Dist.) (holding that "a person may not provoke an assault or voluntarily enter into an encounter and then claim a right of self-defense"). The evidence shows that there was a fight over M.S.'s cellphone that Byrd initially took from her causing a spiral of events. Even though Byrd testified that M.S. was the aggressor, the evidence can be interpreted otherwise. It started when Byrd took her cellphone. He insists that he did not respond to her physical attacks. He maintained throughout that he never physically touched her and that all her injuries were caused by her breaking the windows of his house or falling down because of her intoxication.

{¶ 63} As to the second element, "did not have reasonable grounds to believe or an honest belief he or she was in imminent danger of death or great bodily harm," Byrd's own testimony shows he was not afraid of M.S. He never testified that he was in fear of imminent harm from her. In fact, the video evidence can be viewed to support that it was he who was chasing M.S., taunting her, and causing her to fall. Notable the video evidence shows his foot on M.S.'s neck until she goes limp.

{¶ 64} Regarding the third element, "violated a duty to retreat or avoid danger," no evidence was presented that M.S. prevented Byrd from walking away, going in his house, or getting away from M.S. to avoid danger. Based upon the evidence, Byrd was unable to satisfy all three elements. Ohio courts have consistently held that "'[c]ounsel is certainly not deficient for failing to raise a

meritless issue.'" *State v. Carter,* 2018-Ohio-2238, ¶ 47 (8th Dist.), quoting *State v. Jackson*, 2006-Ohio-174, ¶ 87, citing *State v. Taylor*, 1997-Ohio-243. Specifically, a defense counsel's failure to argue a "self-defense claim is not ineffective assistance of counsel if it does not have sufficient evidence on which to base this claim. Failure to assert an unviable defense does not constitute ineffective assistance." *State v. Davis*, 2021-Ohio-4015, ¶ 26 (8th Dist.), citing *State v. Roberts*, 1996 Ohio App.LEXIS 1873, *5 (8th Dist. May 6, 1996).

{¶ 65} Byrd asserts that his case is similar to *State v. Patterson*, 2016-Ohio-2750 (2d Dist.), wherein the appellate court held that trial counsel was ineffective when he failed to request a self-defense jury instruction when there was evidence that defendant used force to protect himself. In *Patterson*, the defendant testified that the victim was the aggressor and she grabbed her handgun while he was packing his clothing to move out. *Id*. at ¶ 20. He testified that he was afraid of the victim because she was mentally unstable and he felt that she would have shot him. The *Patterson* Court noted that during jury deliberations, the jury asked the trial court if they could consider self-defense; however, the trial court advised the jury that they could not consider self-defense. *Id*. at ¶ 22. The appellate court concluded that trial counsel should have requested a self-defense instruction and that there was a reasonable probability that, but for the trial counsel's unprofessional errors, the result of the proceedings would have been different. *Id*. at ¶ 23.

{¶ 66} We find Byrd's reliance on *Patterson* misplaced for several reasons. First, although Byrd testified that M.S. was the aggressor, he insisted that he did not

respond to her physical attack. He maintained that all of her injuries were self-inflicted and that he never touched her. Therefore, according to Byrd's own testimony, he did not act in self-defense because he did not act at all.

{¶ 67} Second, Byrd did not testify that he was afraid of M.S. or that he feared for his safety. In fact, Byrd can be heard repeatedly taunting and laughing at M.S. when she tried to hit him, spit on him, and mace him. In addition, by his own admission he chased after her multiple times, when he could have easily retreated and returned to his home, locked the doors, and called police. When discussing Byrd's foot on her neck, he explained that he was simply creating "a blockade" so that he could retrieve his phone. By Byrd's own testimony, he shows that he did not have an honest belief that he was in imminent danger of bodily harm.

{¶ 68} Finally, even though Byrd insisted that M.S.'s injuries were self-inflicted, the video evidence does not support his testimony. Multiple videos either show Byrd knocking M.S. to the ground or M.S. getting up from the ground after a gap in recording. Significantly, State's exhibit No. 6 shows Byrd's foot on M.S.'s neck until she goes limp, not that he only used enough pressure to keep her down while he retrieved his phone. Furthermore, the video evidence demonstrates that M.S. is small in stature and appears to be much younger than her 29 years, whereas Byrd was substantially taller, heavier, and much more muscular than M.S. Based on this evidence, it is reasonable to conclude that Byrd used more force than was reasonably necessary to defend himself, in light of the drastic difference in size and strength

between M.S. and Byrd, as well as the numerous opportunities Byrd had to easily end the encounter.

{¶ 69} Given these facts and circumstances, we cannot say that trial counsel was deficient when he did not argue self-defense, because all three elements were lacking, and Byrd continued to insist he never touched M.S. or that he needed to protect himself from imminent bodily harm from M.S. Nor can we say that had trial counsel argued self-defense, the result of the trial would have been different. Therefore, we find that trial counsel was not ineffective.

{¶ 70} Accordingly, Byrd's second assignment of error is overruled.

{¶ 71} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

MICHAEL JOHN RYAN, J., and
DEENA R. CALABRESE, J., CONCUR